2007 WY 112

**WYOMING DEPARTMENT OF REVENUE, Appellant (Defendant),**

v.

**EXXON MOBIL CORPORATION, Appellee (Plaintiff).**

**Board of County Commissioners of the County of Sublette, Appellant (Defendant),**

v.

**Exxon Mobil Corporation, Appellee (Plaintiff).**

**Nos. 06–41, 06–42.**

Supreme Court of Wyoming.

July 18, 2007.

Rehearing Denied Aug. 21, 2007.

  Representing Appellant Wyoming Department of Revenue: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; and William F. Russell, Assistant Attorney General. Argument by Mr. Hardsocg.

Representing Appellant Board of County Commissioners of the County of Sublette: John C. McKinley of Davis & Cannon, Cheyenne, Wyoming.

Representing Appellee Exxon Mobil Corporation: Lawrence J. Wolfe, Patrick R. Day, and Walter F. Eggers, III of Holland & Hart LLP, Cheyenne, Wyoming; and Brent R. Kunz of Hathaway & Kunz, P.C., Cheyenne, Wyoming. Argument by Mr. Day.

Before VOIGT, C.J., and GOLDEN and BURKE, JJ., and SKAVDAHL and PARK, D.JJ.

SKAVDAHL, District Judge.

[¶ 1] In these two consolidated appeals the Department of Revenue ("Department") and the Board of County Commissioners of the County of Sublette ("Sublette County") appeal a declaratory judgment entered by the district court in favor of Exxon Mobil Corporation ("ExxonMobil"), wherein the district court determined that helium produced from federal oil and gas leases in Sublette County is not subject to severance and ad valorem taxation. We will affirm.

## ISSUES

[¶ 2] The Department presents the following statement of issues:

I. Did the District Court incorrectly rule that because Exxon does not possess title to helium at the moment of extraction, that Exxon is not liable for severance tax?

II. Does Exxon's production and severance of helium pursuant to a federal lease and "Sale and Disposition" agreement, in which the federal government briefly retains legal title to the helium, relieve Exxon of severance tax liability?

III. Did the District Court incorrectly conclude that Exxon possesses no contractual or other privilege to sever and extract helium?

IV. Did the District Court incorrectly rule that because Exxon does not possess title to helium at the moment of extraction, that Exxon is not liable for *ad valorem* tax?

V. Does federal law relieve Exxon of state severance or county *ad valorem* tax liability?

VI. Did the District Court err when it failed to determine that the doctrines of res judicata and collateral estoppel barred Exxon's Declaratory Judgment action against the Department?

[¶ 3] Sublette County identifies a single issue:

I. Whether the helium produced by ExxonMobil Corporation from federal lands located in Sublette County, Wyoming is subject to ad valorem (gross products) tax?

[¶ 4] ExxonMobil identifies two issues:

A. Does ExxonMobil owe severance taxes on federal helium owned exclusively by the federal government?

B. Does ExxonMobil owe ad valorem production taxes to Sublette County on federal helium that ExxonMobil buys from the federal government in Lincoln County?

▇ We perceive the issues presented and which we address to be as follows:

1. Did the district court correctly conclude that the doctrines of res judicata and collateral estoppel do not bar ExxonMobil from challenging the imposition of ad valorem or severance tax on helium produced from ExxonMobil's federal leases?

2. Did the district court properly conclude that ExxonMobil does not owe ad valo-

rem taxes to Sublette County for helium produced from ExxonMobil's federal leases?

3. Did the district court properly conclude that ExxonMobil does not owe severance taxes on helium produced from ExxonMobil's federal leases?

## FACTS

■ ExxonMobil operates deep natural gas wells in Sublette County, referred to as the LaBarge project. A discussion of the complexities surrounding gas production from the LaBarge project was recently detailed by this court in *Wyoming Department of Revenue v. Exxon Mobil Corp.*, 2007 WY 21, 150 P.3d 1216 (Wyo.2007). In addition to being a prolific source of various valuable gasses, the wells in the LaBarge project have also been a prolific source of tax litigation.[1] The nature of the taxation issues in this case requires a brief discussion of the factual and legal basis upon which ExxonMobil produces helium from wells in the LaBarge project and the litigation history concerning taxation issues.

[¶ 7] ExxonMobil produces natural gas from deep wells completed into the Madison Formation. The composition of the natural gas stream produced from these deep wells is 65% carbon dioxide, 22% methane, 7.4% nitrogen, 5% hydrogen sulfide, and .6% helium. The subject of this appeal is limited to the .6% helium produced from wells located on federal leases.[2] Due to the unique components of this gas stream, it is gathered and transported via various pipelines to the Black Canyon dehydration plant in Sublette County. At the Black Canyon plant all but .02% of the water in the gas stream is removed. This dehydration is necessary because the carbon dioxide and hydrogen sulfide, when mixed with water, form highly corrosive acids that would damage the pipeline. This gas stream is then transported via pipeline forty miles to the Shute Creek processing facility, located in Lincoln County.

■ At Shute Creek the constituents of the gas stream are separated. This complex process removes the constituents in the following order: hydrogen sulfide, carbon dioxide, methane, nitrogen, and, finally, helium. This separation process results in the helium being liquefied, which is the point at which ExxonMobil purchases the helium from the federal government.

[¶ 9] Pursuant to the Mineral Leasing Act of 1920, 30 U.S.C.A. § 181 (West 2007)[3] and 43 C.F.R. 3100.1 (West 2007),[4] the United States reserved the ownership and the right to extract helium from all gas produced from mineral leases of federal lands. The reservation of helium was originally motivated by national security interests. *See* Helium Act of March 3, 1925, c. 426, 43 Stat.

---

1. *Wyo. Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 21, 150 P.3d 1216; *State ex rel. Sublette County Bd. of County Comm'rs v. State*, 2001 WY 91, 33 P.3d 107 (Wyo.2001); *Exxon Corp. v. Bd. of County Comm'rs, Sublette County*, 987 P.2d 158 (Wyo.1999); *Amoco Prod. Co. v. State*, 751 P.2d 379 (Wyo.1988).

2. The issues in this appeal are limited to helium that is produced from federal leases. Pursuant to state leases, ExxonMobil is granted the right to explore and produce helium. Thus, ExxonMobil does not challenge the imposition of severance and ad valorem taxes for that portion of helium produced from state leases.

3. The applicable portion of 30 U.S.C.A. § 181 (West 2007) provides:

    Deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite (including all vein-type solid hydrocarbons), or gas, and lands containing such deposits owned by the United States, ... except as hereinafter provided, shall be subject to disposition in the form and

manner provided by this chapter to citizens of the United States, or to associations of such citizens, or to any corporation organized under the laws of the United States, or of any State or Territory thereof, or in the case of coal, oil, oil shale, or gas, to municipalities.

    . . . .

    The United States reserves the ownership of and the right to extract helium from all gas produced from lands leased or otherwise granted under the provisions of this chapter, under such rules and regulations as shall be prescribed by the Secretary of the Interior: *Provided further*, That in the extraction of helium from gas produced from such lands it shall be so extracted as to cause no substantial delay in the delivery of gas produced from the well to the purchaser thereof.

4. 43 C.F.R. § 3100.1 (West 2007) provides:

    The ownership of and the right to extract helium from all gas produced from lands leased or otherwise disposed of under the Act have been reserved to the United States.

1110.[5] The federal leases applicable to the wells from which helium and other natural gases are produced were issued prior to 1965 and expressly provide that ExxonMobil "is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all of the oil and gas deposits, **except helium gas. . . .**" (Emphasis added). These leases reserve to the federal government "the ownership and the right to extract helium from all gas produced under this lease. . . ." The leases reserve to the federal government the right to construct and operate facilities on the leased premise to remove helium from the gas stream produced under the lease:

> Section 3(d). *Helium.*—Pursuant to section 1 of the act, and section 1 of the act of March 3, 1927 (44 Stat. 1387), as amended, **the [federal government reserves] ownership and the right to extract helium from all gas produced under this lease,** subject to such rules and regulations as shall be prescribed by the Secretary of the Interior. In case the lessor elects to take the helium the lessee shall deliver all gas containing same, or portion thereof desired, to the lessor at any point on the leased premises in the manner required by the lessor, for the extraction of the helium in such plant or reduction works for that purpose as the lessor may provide, whereupon the residue shall be returned to the lessee with no substantial delay in the delivery of gas produced from the well to the purchaser thereof. The lessee shall not suffer a diminution of value of the gas from which the helium has been extracted, or loss otherwise, for which he is not reasonably compensated, save for the value of the helium extracted. The lessor further reserves the right to erect, maintain, and operate any and all reduction works and other equipment necessary for the extraction of helium on the premises leased.

(Emphasis added). Thus, ownership of the helium contained in the gas stream produced from ExxonMobil's wells located on these federal leases remains with the federal government, which also retains the right to extract it from the gas stream.

[¶ 10]  At the time ExxonMobil was constructing the Shute Creek processing facilities in the mid–1980s, it contemplated the value in constructing facilities which would allow for the extraction and sale of helium. Thus, due to the federal government's ownership and right of extraction of the helium, ExxonMobil sought to purchase the helium from the federal government. Negotiations were successful and on June 1, 1985, ExxonMobil and the federal government entered into a "Helium Sale and Disposition Agreement" ("Helium Agreement.")

The Helium Agreement provides in pertinent part:

## ARTICLE II

### TRANSFER OF TITLE

2.1  Seller retains title to and ownership of helium underlying Said Lands, but during the term of this Agreement Buyer shall have the exclusive <u>right and privilege to</u> (i) <u>take possession of</u> the gas stream produced from Said Lands for the purpose of extracting helium from said gas stream to the extent the gas stream is processed in the Shute Creek Gas Processing Plants constructed or to be constructed in Lincoln and Sweetwater Counties, Wyoming and (ii) <u>extract in the form of crude helium,</u> in such gas processing plants, the helium component of not to exceed 511 billion standard cubic feet of raw inlet gas per Contract Year during the term of this Agreement.  <u>Seller agrees to sell to Buyer the helium contained in such crude helium so extracted by Buyer during the term of this Agreement, for the consideration set forth</u> hereinbelow.  Buyer shall be granted title to such helium purchased by Buyer hereunder at the point where the crude helium is extracted from said gas stream. Both parties agree that this grant does not increase or decrease the rights of lessees under oil and gas leases covering any of Said Lands.  Helium to which Buyer obtains title under this Agreement does not constitute "Bureau of Mines helium" or

---

5.  Current Act can be found at 50 U.S.C.A. ¶¶ 167, et. seq.

"Bureau helium" for purposes of 50 U.S.C. § 167d and 30 C.F.R. Part 602. (Emphasis in original). The Helium Agreement initially had a primary term of 20 years, but has since been amended to a primary term of 25 years, until November 1, 2011. Under the Helium Agreement, ExxonMobil pays the federal government a percentage of the proceeds received from its resale of the helium.

[¶ 11] ExxonMobil extracts the crude helium from the gas stream at the outlet of the nitrogen recovery unit at the Shute Creek plant in Lincoln County, which is the final step in processing. Due to the significant amount of helium that unavoidably escapes prior to processing and extraction, ExxonMobil did not want to purchase helium from the federal government any sooner in the process than necessary, thus avoiding this risk of loss between the wellhead and ultimate extraction.[6] Under the terms of the Helium Agreement, this is the point at which the federal government conveys title of the helium to ExxonMobil.

[¶ 12] As noted, in November of 1986, ExxonMobil first began selling helium extracted from the gas stream produced from the federal leases. Almost immediately, disputes began to arise over the taxation of the various components of this gas stream. These taxation disputes ultimately culminated in a January 12, 1989, Tax Settlement Agreement ("TSA"), between the Department, Sublette County, and ExxonMobil. The details surrounding the development of the TSA were most recently explored by this Court in *Wyo. Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 21, 150 P.3d 1216.

[¶ 13] Pertinent to the issues presently before this Court, the TSA provided that in exchange for ExxonMobil's payment of $12 million to the State of Wyoming and Sublette County, ExxonMobil's severance and ad valorem tax liability for 1986, 1987, and 1988 would be considered satisfied. The TSA also provided that specific valuation methods would be used, for severance and ad valorem taxes, for LaBarge production from January 1, 1989 through August 31, 1991. In ex-

change for the State and Sublette County's agreement, ExxonMobil agreed that, during this time period, it would not contest the applicability of ad valorem and severance taxes to federal helium. The TSA also set forth the valuation methodology to be used after August 31, 1991, and provided that if the State utilized any other method "the Parties agree that the question of future taxability, for severance and ad valorem purposes, and value of future helium production remain open and are not resolved by this Agreement." *See Exxon Corp. v. Bd. of County Comm'rs, Sublette County*, 987 P.2d 158, 161 (Wyo.1999). By letter dated May 21, 2004, the Department advised ExxonMobil that it would no longer recognize the January 12, 1989, TSA. The Department further demanded that ExxonMobil report and pay production taxes on all products, including helium. Predictably, in response, ExxonMobil filed suit seeking a declaratory judgment as to the applicability of ad valorem and severance taxes to the helium produced from these federal leases.

[¶ 14] On cross-motions for summary judgment the district court concluded that the Department and Sublette County could not lawfully impose severance and ad valorem taxes on sales proceeds obtained by ExxonMobil from the resale of the helium purchased from the federal government under the Helium Agreement. The Department and Sublette County separately appealed the district court's order. Due to the similarity of issues presented, this Court consolidated both appeals.

**STANDARD OF REVIEW**

[¶ 15] This Court's standard for the review of summary judgments applies equally in declaratory judgment actions. *Laughter v. Bd. of County Comm'rs*, 2005 WY 54, ¶ 9, 110 P.3d 875, 879 (Wyo.2005). Under that standard, summary judgment is proper "if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P.

---

6. Elemental helium is so small and light that it can migrate through steel pipelines.

56(c). A genuine issue of material fact exists when a disputed fact, if proven, would establish or refute an essential element of a cause of action or a defense that a party has asserted. *Metz Beverage Co. v. Wyo. Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo.2002). We evaluate the propriety of a summary judgment by employing the same standards and examining the same material as the district court. This Court examines the record *de novo*, in the light most favorable to the party opposing the motion, affording that party the benefit of all favorable inferences that may be drawn from the record. If, after a review of the record, any doubt exists as to the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment. *See Thompson–Green v. Estate of Drobish*, 2006 WY 126, ¶ 5, 143 P.3d 897, 899 (Wyo.2006). Issues of statutory interpretation present questions of law, which are reviewed *de novo*. *See Powder River Coal Co. v. Wyo. Dep't of Revenue*, 2006 WY 137, ¶ 9, 145 P.3d 442, 446 (Wyo.2006). As to issues of law, this Court affords no deference to the district court's determinations. *See Colo. Cas. Ins. Co. v. Sammons*, 2007 WY 75, ¶ 11, 157 P.3d 460, 465 (Wyo.2007).

## DISCUSSION

1. **Did the district court correctly conclude that the doctrines of res judicata and collateral estoppel do not bar ExxonMobil from challenging the imposition of ad valorem or severance tax on helium produced from ExxonMobil's federal leases?**

[¶ 16] The Department asserts that in *Amoco Production Co. v. State*, 751 P.2d 379 (Wyo.1988), ExxonMobil, along with other parties, challenged the Department's taxation of helium and lost. Thus, the Department contends that ExxonMobil is barred from revisiting the taxability of helium produced from these federal leases. ExxonMobil contends that the ordinary rules regarding res judicata are inapplicable to declaratory judgment actions. Nonetheless, ExxonMobil contends that its request for a declaration that severance and ad valorem taxes may not be imposed on helium from these federal leases is a new claim. A review of the issues presented demonstrates that the principles of collateral estoppel and res judicata do not bar ExxonMobil's declaratory judgment action in this case.

[¶ 17] The doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) incorporate a universal legal principle of common-law jurisprudence to the effect that "a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies." *See Osborn v. Kilts*, 2006 WY 142, ¶ 9, 145 P.3d 1264, 1266 (Wyo.2006) (quoting *Osborn v. Manning*, 798 P.2d 1208, 1210 (Wyo.1990)).

[¶ 18] The application of res judicata or collateral estoppel requires an evaluation of similar factors. Res judicata may be applied where four factors are found to exist: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them. *Markstein v. Countryside I, L.L.C.*, 2003 WY 122, ¶ 15, 77 P.3d 389, 394 (Wyo.2003). Res judicata also precludes a party from raising issues that could have been raised in the first action. *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2002 WY 181, ¶ 12, 60 P.3d 129, 135 (Wyo. 2002).

[¶ 19] Application of collateral estoppel is dependent upon consideration of four similar factors: (1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Phillips v. Toner*, 2006 WY 59, ¶ 7, 133 P.3d 987, 990 (Wyo.2006). The issue, as to the very application of severance and ad valorem taxes to helium produced from Exx-

onMobil's federal lease, is not identical nor does it arise from the same transaction or series of transactions as were litigated in *Amoco Prod. Co. v. State,* 751 P.2d 379.

[¶ 20] In *Amoco Prod. Co. v. State, see supra* ¶¶ 16, 19, Amoco, Chevron, and Exxon filed a declaratory judgment action in which they sought a determination as to the severance tax rate to be applied to non-hydrocarbon gases under Wyo. Stat. Ann. § 39–6–302 (Michie 1977). *Id.* at 380. That determination was dependent upon what constituted "natural gas" as used in the statute. This Court summarized the contentions of the parties in 1988:

> The State of Wyoming contends that the correct excise tax upon the privilege of severing or extracting $CO_2$ gas is six percent. Appellants contend that $CO_2$ is not natural gas, that the correct tax is two percent, and that they should have a refund of tax paid of more than $615,000.

*Id.* at 380. This tax was imposed on the $CO_2$ produced by appellants during the first quarter of 1986. This Court went on to determine whether carbon dioxide, as well as other constituents including helium, was "natural gas" as that term was used under Wyo. Stat. Ann. § 39–6–302(a) (Michie 1977). The issue of whether the helium produced from ExxonMobil's federal leases was subject to severance or ad valorem taxes was not raised or even considered. In fact, the only taxes at issue were those assessed on $CO_2$ for the first quarter of 1986.

[¶ 21] The undisputed facts in this case establish that ExxonMobil first began selling helium extracted from the gas stream produced from federal leases in November of 1986. Thus, unlike the circumstances in *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue,* 60 P.3d 129, ExxonMobil is not seeking to make yet another challenge to the taxes that were imposed in the first quarter of 1986 on $CO_2$ production. There is no evidence to suggest or support that the present declaratory judgment filed by ExxonMobil is an attempt to raise an additional or alternative challenge to the taxation that was at issue or that could have been raised in *Amoco Prod. Co. v. State,* 751 P.2d 379. To the contrary, ExxonMobil, the State, and

Sublette County entered into the TSA which, until now, put to rest issues concerning the imposition of severance and ad valorem taxes to helium produced from ExxonMobil's federal leases.

[¶ 22] The history between these parties clearly indicates that ExxonMobil has always taken the position that helium produced from its federal leases is not subject to severance or ad valorem taxes. As recited in the TSA between these parties:

> 5. Exxon has not paid, except for severance tax on helium produced from State lands, severance and ad valorem tax for production occurring in 1986 or 1987 because the State and Exxon had not agreed on a taxable value.
>
> 6. Exxon is acquiring helium produced from federal lands pursuant to an agreement with the federal government, which owns that helium. Because Exxon contends that the Wyoming statutes cannot tax helium owned by the federal government, Exxon has not paid tax on the helium produced from Federal lands in 1986, 1987, and 1988. Exxon has paid taxes on helium produced from State lands in the amount of $42,474.15.

The TSA further expressly reserved to ExxonMobil the right, in the future, to challenge the taxability of helium produced from these federal leases in the event the State no longer applied the valuation methodology under the TSA. This Court has previously recognized that parties may enter into settlements or consent judgments without being subject to later claims of collateral estoppel. *See Amoco Prod. Co. v. Bd. of County Comm'rs of Sweetwater County,* 2002 WY 154, ¶¶ 12–15, 55 P.3d 1246, 1250–52 (Wyo.2002). By virtue of the TSA the parties reserved until another day a determination as to the imposition of severance and/or ad valorem taxes on the helium produced from ExxonMobil's federal leases.

[¶ 23] The issues presented in this case are not identical to those presented or decided in *Amoco Prod. Co. v. State,* 751 P.2d 379. The district court correctly concluded that the doctrines of collateral estoppel and res judicata do not apply to bar ExxonMobil's declaratory judgment action. Given this resolution, we find no need to address the appli-

cability or inapplicability of the doctrine of res judicata to declaratory judgment actions.

## 2. Did the district court properly conclude that ExxonMobil does not owe ad valorem taxes to Sublette County for helium produced from ExxonMobil's federal leases?

■ [¶ 24] The imposition of an ad valorem property tax on mineral production is authorized pursuant to the Wyoming Constitution:

> All mines and mining claims from which gold, ... coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, **as may be prescribed by law;** provided, that the product of all mines shall be taxed in proportion to the value thereof.

Wyo. Const. art. 15, § 3 (emphasis added). The ad valorem tax is a property tax which is based upon the full value of the property when produced. Wyo. Stat. Ann. § 39–13–101(a)(ii) (LexisNexis 2007); *see Union Pac. Res. Co. v. State*, 839 P.2d 356, 361 n. 1 (Wyo.1992). The Wyoming Legislature has defined taxpayer for purposes of ad valorem taxes on natural gas:

> In the case of ad valorem taxes on crude oil, lease condensate or natural gas produced under lease, the lessor is liable for the payment of ad valorem taxes on crude oil, lease condensate or natural gas production removed only to the extent of the lessor's retained interest under the lease, whether royalty or otherwise, and the lessee or his assignee is liable for all other ad valorem taxes due on production under the lease[.]

Wyo. Stat. Ann. § 39–14–203(c)(i) (LexisNexis 2007). In this case, Sublette County contends that the Helium Agreement between ExxonMobil and the federal government is simply a ruse to manipulate the state and county · taxation system. Sublette County contends that the Helium Agreement vests in ExxonMobil all the incidents of ownership in Sublette County and, therefore, imposition of the ad valorem tax on the helium produced from these leases in Sublette County is appropriate. This argument is not supported by either the facts or law.

[¶ 25] Under the Mineral Leasing Act of 1920, the United States Congress determined that it should reserve the ownership and right to extract helium from all gas produced from federal mineral leases. 30 U.S.C.A. § 181 (West 2007). Consistent with this reservation, the federal leases at issue in this case reserve unto the federal government the ownership and right to extract helium from all gas produced under these federal leases. Due to these restrictions, which were imposed by the federal government without regard to Wyoming severance or ad valorem taxes, ExxonMobil is required to purchase the helium following its extraction from the natural gas stream. Moreover, the point at which this purchase occurs under the Helium Agreement is in Lincoln County because of engineering requirements and the physical properties of helium. Thus, it cannot be concluded that the Helium Agreement is a ruse, simply created for the purpose of tax manipulation. Given federal law, it was and is necessary to convey the helium to ExxonMobil once it is extracted from the gas stream. This point is located at the Shute Creek facility in Lincoln County.

■ [¶ 26] The Wyoming Legislature holds the exclusive authority to define a taxpayer under Wyoming law. *Wyo. State Tax Comm'n v. BHP Petroleum Co.*, 856 P.2d 428, 434 (Wyo.1993). For purposes of ad valorem taxes on natural gas the legislature has defined taxpayer as the lessor, lessee, or the lessee's assignee. Wyo. Stat. Ann. § 39–14–203(c)(i). Due to the unique circumstances created by Congress' reservation of helium in the Mineral Leasing Act of 1920, and the federal leases issued pursuant thereto, ExxonMobil does not fit within any of these categories. Accordingly, the district court correctly concluded that ExxonMobil does not owe ad valorem taxes to Sublette County for helium produced from ExxonMobil's federal leases.

## 3. Did the district court properly conclude that ExxonMobil does not owe severance taxes on helium produced from ExxonMobil's federal leases?

[¶ 27] Severance taxes are imposed pursuant to Wyo. Stat. Ann. § 39–14–203(a)(i) (LexisNexis 2007):

There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state....

The legislature has defined "taxpayer" for the purposes of severance taxes as

... any person extracting crude oil, lease condensate or natural gas and any person owning an interest in the crude oil, lease condensate or natural gas production to the extent of their interest ownership are liable for the payment of the severance taxes together with any penalties and interest.

Wyo. Stat. Ann. § 39–14–203(c)(ii) (Lexis-Nexis 2007). The Department contends under these statutes that a severance tax is imposed upon the entity severing or extracting minerals, which is not dependent or contingent upon contractual rights or ownership. Thus, by having physically severed or extracted helium from the ground, ExxonMobil is liable for severance taxes on the helium. ExxonMobil contends that under the applicable statutes, severance taxes are imposed on the exercise of a legal privilege to sever or produce gas arising out of mineral ownership, which ExxonMobil lacks due to the reservations under the federal leases. We find that the language under the statutes, and the unique reservation under the federal leases, precludes assessment of severance taxes upon Exxon Mobil for the helium produced from these federal leases.

[¶ 28] The issues presented require an interpretation of the controlling statutes. Our rules of statutory interpretation are well established:

In the conduct of statutory interpretation, we begin by inquiring into the ordinary and obvious meaning of the words employed by the legislature according to the manner in which those words are arranged. If more than one reasonable interpretation exists, we resort to general principles of statutory construction. When the legislature has spoken in unambiguous terms, however, we are bound to the results so expressed.

*Wyodak,* ¶ 18, 60 P.3d at 137 (citations omitted). This Court has an obligation to make sense out of a statute and give full force and effect to the legislative product; in construing statutes, intention of the law-making body must be ascertained from the language of the statute as nearly as possible. A statute must not be given a meaning which would nullify its operation if it is susceptible to another interpretation. *Hasser v. Flint Eng'g,* 647 P.2d 66, 69–70 (Wyo.1982). Likewise, we will not construe a statute in a way that renders a portion of it meaningless.

[¶ 29] This Court must also be mindful of the principles related to tax imposition statutes. Under our precedent, tax imposition statutes are to be construed in favor of the taxpayer and are not to be extended absent clear intent of the legislature. *Qwest Corp. v. State ex rel. Wyo. Dep't of Revenue,* 2006 WY 35, ¶ 8, 130 P.3d 507, 511 (Wyo.2006). In interpreting statutes levying taxes, it is the established rule not to extend their provisions by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. "In case of doubt, they are construed most strongly against the government and in favor of the citizen." *Amoco Prod. Co. v. Dep't of Revenue,* 2004 WY 89, ¶ 18, 94 P.3d 430, 438 (Wyo.2004). As summarized in *Qwest Corp.,*

taxes may not be imposed by any means other than a clear, definite and unambiguous statement of legislative authority. *Chevron U.S.A., Inc.* [*v. State* ], 918 P.2d [980,] 984 [ (Wyo.1996) ]; *Amoco Production Co.* [*v. Dep't of Revenue,* 2004 WY 89], ¶ 18[, 94 P.3d 430, 438 (Wyo.2004) ]. *See also* Wyo. Const. art. 15, § 13 (stating "[n]o tax shall be levied, except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied.").

¶ 9, 130 P.3d at 511.

[¶ 30] In *State ex rel. Department of Revenue v. Union Pacific Railroad Co.,* 2003 WY 54, ¶ 12, 67 P.3d 1176, 1182 (Wyo.2003) (citations omitted), we recognized:

When the words are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others,

for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. Moreover, "[a]ll statutes must be construed *in pari materia;* and in ascertaining the meaning of a given law, all statutes relating to the same subject or hav[ing] the same general purpose must be considered and construed in harmony."

Therefore, in performing our review, we look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. We have said that divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity. However, the fact that opinions may differ as to a statute's meaning is not conclusive of ambiguity. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *Id.,* ¶ 12, 67 P.3d at 1182–83.

[¶ 31] In determining whether these statutes are ambiguous it is helpful to note the construction the Department placed on the statutes which it is charged with administering. This Court has previously held that an agency's interpretation of the statutory language which the agency normally implements is entitled to deference, unless clearly erroneous. *Buehner Block Co. v. Wyo. Dep't of Revenue,* 2006 WY 90, ¶ 11, 139 P.3d 1150, 1153 (Wyo.2006). Moreover, this Court generally defers to the construction placed on a statute by the agency that is charged with its execution, provided that construction does not conflict with the legislature's intent. *Qwest,* ¶ 8, 130 P.3d at 511; *see also Loberg v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2004 WY 48, ¶ 9, 88 P.3d 1045, 1049 (Wyo.2004) (one measure of a statute's meaning is the interpretation placed on it by the agency charged with its administration); *State ex rel. Sublette County Bd. of County*

*Comm'rs v. State,* 2001 WY 91, ¶ 16, 33 P.3d 107, 113 (Wyo.2001). In this case, the Department's own rule, at the time ExxonMobil filed the declaratory judgment, provided:

The severance tax is an excise **tax imposed on the** present and continuing **privilege of removing, extracting, severing or producing** any mineral in this state, and the incidence of the severance tax is upon all interest owners in proportion to their ownership shares, . . .

Department of Revenue Rules and Regulations, ch. 6, § 5(a)(ii) (2006) (emphasis added). As analyzed below, this interpretation does not appear inconsistent with the statutory provisions.

[¶ 32] Under Wyo. Stat. Ann. § 39–14–203(a)(i), a severance tax is imposed "on the value of the gross product extracted **for the privilege of severing or extracting** . . . natural gas in the state." Under ExxonMobil's federal leases, at the time they were issued, the United States reserved "the ownership of and the right to extract helium from all gas produced from lands leased . . . ." 30 U.S.C.A. 181 (West 2007). This language was also contained in the actual leases which are the subject of this litigation. ExxonMobil does not possess the privilege of removing, extracting, severing or producing the helium. By virtue of Congress' limitations under the Mineral Leasing Act of 1920, the privilege of severing or extracting helium has not and cannot be assigned or conveyed to ExxonMobil.[7] This legal limitation necessitated the 1985 Helium Agreement, under which the federal government sells the crude helium, following its extraction from the gas stream.

[¶ 33] This unique situation is unlike that presented in *BHP Petroleum Co., Inc. v. State,* 784 P.2d 621 (Wyo.1989), where BHP owned a percentage of the gas produced and, by virtue of the operating agreement, was conveyed the privilege or right to sever or extract the oil and gas produced from the unit it operated and managed on behalf of various working interest owners. *BHP Petroleum Co. v. State of Wyo. Tax Comm'n,*

---

**7.** As noted by the parties, Congress passed the Helium Privatization Act of 1996, Pub.L. No. 104–273, 1996 U.S.C.C.A.N. (110 Stat.) 3315. This Act allows the leasing of helium, but does not apply and obviously was not in effect at the time the leases were issued or the Helium Agreement was entered into between the federal government and ExxonMobil.

766 P.2d 1162, 1163 (Wyo.1989); *Wyo. State Tax Comm'n v. BHP Petroleum Co.,* 856 P.2d at 430. Moreover, there is no evidence that this unique factual and legal situation was manipulated by ExxonMobil for purposes of tax avoidance. The unambiguous language under Wyo. Stat. Ann. § 39–14–203(a) (LexisNexis 2007) supports the district court's determination that ExxonMobil was not subject to severance taxes for helium purchased from the federal government. Accordingly, the decision of the district court is affirmed.

## CONCLUSION

[¶ 34] The district court did not err in finding that the doctrines of collateral estoppel and res judicata did not apply to bar ExxonMobil's declaratory judgment action. Furthermore, the district court did not err in determining that severance and ad valorem taxes do not apply to the helium produced from these federal leases and purchased by ExxonMobil pursuant to the Helium Agreement.