2011 WY 161

**EXXON MOBIL CORPORATION,**
**Appellant (Petitioner),**

v.

**WYOMING DEPARTMENT OF**
**REVENUE, Appellee**
**(Respondent).**

**State of Wyoming, through Wyoming**
**Department of Revenue, Appellant**
**(Cross–Petitioner)**

v.

**Exxon Mobil Corporation, Appellee**
**(Cross–Respondent).**

**Nos. S–11–0047, S–11–0048.**

Supreme Court of Wyoming.

Dec. 9, 2011.

Representing Exxon Mobil Corporation: Lawrence J. Wolfe, P.C. and Patrick R. Day, P.C., Holland & Hart LLP, Cheyenne, Wyoming; Brent R. Kunz, Hathaway & Kunz, P.C., Cheyenne, Wyoming. Argument by Mr. Day.

Representing Wyoming Department of Revenue: Gregory A. Phillips, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before GOLDEN, HILL, VOIGT, and BURKE, JJ., and CRANFILL, D.J.

CRANFILL, District Judge.

This case arrives before the Court once again from a decision rendered by the State Board of Equalization ("Board") concerning the valuation point for tax purposes of the natural gas production from the La-Barge Field in Sublette County. Previously, in *Exxon Mobil Corp. v. State of Wyo., Dep't of Revenue*, 2009 WY 139, 219 P.3d 128 (Wyo.2009), this Court interpreted the terms "initial dehydrator" and "processing facility" and analyzed the proportionate profits valuation method. The Court, however, remanded one issue to the Board: specifically, whether the meters located at the LaBarge Field well sites were "custody transfer meters" as defined by Wyo. Stat. Ann. § 39–14–203(b)(iv) [1] or volume meters for Exxon's share of gas production. The Board held that the meters were not custody transfer meters for Exxon's share of gas production because Exxon

did not actually transfer its gas to another entity at the meters. The Board further held that the same meters were custody transfer meters for the gas produced by two other working interest owners, Howell Petroleum Company ("Howell") and Yates Petroleum Corporation ("Yates"). Howell and Yates were not parties to the action.

[¶ 2] Both Exxon and the State of Wyoming, Department of Revenue ("Department") appealed the Board's decision to the district court, Exxon appealing in S–11–0047 and the Department appealing in S–11–0048. Pursuant to W.R.A.P. 12.09(b), the district court certified the cases directly to us for review. The Court consolidated the two appeals for decision. We will affirm the Board's determination that the meters were not custody transfer meters for Exxon's gas, but reverse the Board's determination that the meters were custody transfer meters for Howell's and Yates' gas.

## ISSUES

[¶ 3] Exxon states the issues as follows:

1. Did the State Board of Equalization err in its application of the statutory term "custody transfer meter" to value ExxonMobil's natural gas production?

2. Did the State Board of Equalization err when it held that working interest owners Howell and Yates deliver their LaBarge natural gas stream to Exxon-Mobil through "custody transfer meters" at the wells, as that term is used in Wyo. Stat. § 39–14–203(b)(iv)?

The Department identifies similar issues, albeit phrased differently:

1. Did the State Board have authority to rule on the point of valuation for natural gas owned by two entities, not parties to the State Board's proceedings— Howell Petroleum Corporation and Yates Petroleum Corporation (and their successors)?

---

1. Wyo. Stat. Ann. § 39-14-203(b)(iv) provides the basis for severance tax levied on natural gas production. The statute states "[t]he production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs be-

fore the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever comes first."

2. If so, did the State Board correctly determine that the allocation meters were "custody transfer meters" for Howell Petroleum Corporation's and Yates Petroleum Corporation's 2005 gas production?

3. Did the State Board of Equalization correctly determine that because Exxon Mobil Corporation did not transfer custody or control of its LaBarge gas production at well site meters, the meters were not "custody transfer meters" for determining the taxable point of valuation for Exxon's gas production in accordance with Wyo. Stat. Ann. § 39–14–203(b)(iv)?

4. Because it was admitted that Exxon Mobil Corporation did not transfer its LaBarge gas at the meters in question, did the State Board of Equalization correctly reject Exxon's attempt to adopt, for its own gas, the point of valuation it imputed to another taxpayer's gas interest?

### FACTS

[¶ 4] The facts in this case are essentially undisputed. This Court will therefore rely largely on paraphrases of and quotations from the Board's Findings of Fact. The Court commends the Board for providing a comprehensive and detailed factual background.

[¶ 5] Exxon operates three federal natural gas units, Fogarty Creek Unit, Lake Ridge Unit and Graphite Unit. These units constitute the LaBarge Field in the Bridger–Teton National Forest in Sublette County, Wyoming. Exxon is the sole lessee of the federal leases in the Lake Ridge and Graphite Units and therefore owns all of the unitized substances in these units. There are, however, other leaseholders in the Fogarty Creek Unit. Specifically, Howell and Yates, or their successors in interest,[2] own seven percent (7%) of all unitized substances in the Fogarty Creek Unit. Howell's and Yates' seven percent (7%) interest in the Fogarty Creek Unit accounts for five percent

(5%) of total production from all three units combined.

[¶ 6] Exxon produces LaBarge sour gas from eighteen (18) wells. Each well site has a "well building" that contains equipment to assist in production and movement of the gas from the wellhead downstream. Near the wellheads are meters that measure gas volumes.

[¶ 7] Each unit is governed by a unit operating agreement which identifies the "operator" for all production within the unit, and defines how each unit will be developed. Exxon is the operator for all three units. The unit operating agreement designates the rights and responsibilities of the unit operator and working interest owners. The unit operating agreement for the Fogarty Creek Unit requires Howell and Yates to either take their gas in kind or separately dispose of it. The agreement further states that should Howell or Yates not take their gas in kind or separately dispose of it their gas will be "banked." In other words, Howell's and Yates' respective shares of gas are left in the ground and one-hundred percent (100%) of production is attributed to Exxon until Howell and Yates can take their gas in kind or separately dispose of it through a processing agreement or otherwise.

[¶ 8] Further downstream from the units is the Shute Creek processing facility, which was first constructed in 1984. At the time the Shute Creek plant was constructed, Exxon offered Howell and Yates the opportunity to acquire ownership interest in the plant. Howell and Yates declined to exercise any ownership interest in the facilities constructed downstream of the LaBarge Field. However, because Howell's and Yates' shares of the gas would have to be processed at the Shute Creek facility the parties attempted to negotiate a processing agreement for Howell's and Yates' share of the gas. After negotiations reached an impasse, Howell and Yates filed an antitrust lawsuit against Exxon.

[¶ 9] The antitrust litigation was resolved by the parties negotiating a complex processing agreement, referred to as the "Howell

---

**2.** For simplicity the Court will refer to Howell and Yates and their successors in interest as "Howell and Yates" for the remainder of this decision.

and Yates Agreements." The basic term of the agreement was that Exxon would process Howell's and Yates' share of gas from the Fogarty Creek Unit in exchange for Howell and Yates paying Exxon a fee equal to sixty-five percent (65%)of the gross revenues received from the sale of their shares of production.

[¶ 10] Exxon exclusively owns all facilities downstream of the wing valve on the wellhead including the gathering lines, manifolds, Black Canyon facility, the pipeline from Black Canyon to Shute Creek, and Shute Creek. All the cost for facilities after the wing valve are incurred by Exxon, which is compensated for the costs of owning and operating these facilities for the benefit of the other working interests owners by the terms of the Howell and Yates Agreements.

[¶ 11] Article 7.1 of the Howell and Yates Agreements provides that possession, custody and control of Howell's and Yates' gas is transferred to Exxon for processing immediately downstream of the wing valve on the wells, as measured by the meters located at each well. Accordingly, Exxon takes custody of, but not title to, the raw gas at the wing valve and meters. Title to the gas remains with the working interest owner, however.

[¶ 12] Each Fogarty Creek Unit well has multiple "working interest" owners.[3] Despite the fact that Fogarty Creek is unitized, each well has a slightly different working interest ownership because of the parties who are "nonconsents,"[4] and because the wells were originally drilled in a manner inconsistent with the federal unit drilling blocks. Exxon must therefore perform an exact accounting for each Fogarty Creek well separately to determine what percentage ownership in each well is attributable to Exxon and the other working interest owners. The meters at the wells are used to measure this production and to properly account for the working interest and royalty ownership of the gas. Although Exxon owns the entire working interest in the Lake Ridge and Graphite Units, each well must be individually metered since the gas from all three units is combined for processing through common facilities downstream. The total production for the LaBarge Field is allocated to working interest owners based on each individual well. In order to properly calculate one working interest owner's share of production in a Fogarty Creek well, Exxon must know the amount of production of all the LaBarge Field wells. The Bureau of Land Management Minerals Management Service ("MMS") also requires individual meters at each well in all of the LaBarge Field units.

[¶ 13] The matters giving rise to the instant litigation commenced in 2006 when Exxon filed its annual gross products return with the Department reporting its 2005 natural gas production from the LaBarge Field. The Department declined to accept Exxon's reported values for the 2005 LaBarge Field production. Disputes concerning the taxation of LaBarge Field gas were previously addressed by this Court in *RME Petroleum Co. v. Wyo. Dep't of Revenue*, 2007 WY 16, 150 P.3d 673 (Wyo.2007); *Wyo. Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, 162 P.3d 515 (Wyo.2007); and *Exxon*, 2009 WY 139, 219 P.3d 128. In the most recent opinion, the Court remanded one issue to the Board "to determine the correct point of valuation in accordance with this opinion" in the context of whether the meters at the wells were custody transfer or volume meters. *Exxon*, ¶ 52, 219 P.3d at 143. Exxon argued that the meters at the wells were custody transfer meters, and hence the correct point of valuation for its share of gas. Conversely, the Department argued the meters were not custody transfer meters and that the statutory point of valuation for tax purposes for all gas produced in the LaBarge field is the inlet of Black Canyon. The

**3.** A "working interest" is the "interest granted under an oil and gas lease, giving the lessee the right to work on the leased property to search for, develop and produce oil and gas and the obligation to pay all costs of production." Wyo. Stat. Ann. § 30–5–304(a)(viii).

**4.** "Nonconsents" are working interest owners who do not participate in the cost of drilling the well. Ordinarily, "nonconsent" owners cannot receive any proceeds from the well until the working interest owners have been compensated for the cost of drilling plus a penalty. *State Board of Equalization Findings of Fact*, ¶¶ 2, 18. *See also*, Wyo. Stat. Ann. § 30–5–109(g).

Board determined that the meters were not custody transfer meters for gas owned by Exxon because Exxon did not actually transfer control or charge its gas to another entity at the meters. However, the Board determined that the same meters were custody transfer meters for gas owned by Howell and Yates because pursuant to the Howell and Yates Agreements responsibility for the working interest owners' gas is transferred to Exxon at the meters.

### STANDARD OF REVIEW

[¶ 14] Our review of an administrative agency's decision is governed by the Wyoming Administrative Procedure Act, which, in pertinent part, provides that the reviewing court shall:

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c)(ii).

[¶ 15] We affirm an agency's findings of fact if they are supported by substantial evidence. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). We review an agency's conclusion of law *de novo. Id.,* ¶ 26, 188 P.3d at 561. To summarize, administrative agency action must be set aside only when the agency has: (1) acted arbitrarily; (2) acted capriciously; (3) acted contrary to law; (4) abused its discretion; (5) violated a constitution;

(6) acted beyond its statutory authority; (7) failed to observe legally required procedures; or (8) made findings or reached conclusions unsupported by substantial evidence.

*Northfork Citizens For Responsible Dev. v. Bd. of County Comm'rs of Park County,* 2010 WY 41, ¶ 17, 228 P.3d 838, 845 (Wyo. 2010).

### DISCUSSION

**I. Exxon's Point of Valuation–Are the meters custody transfer meters for Exxon's share of gas?**

[¶ 16] When this case was most recently before the Court we remanded one issue to the Board to determine the proper tax valuation point for Exxon's LaBarge Field gas. The Court summarized and remanded with the following directive:

ExxonMobil urges us to choose among these three options [for its tax valuation point].[5] [Exxon] asserts that there is a custody transfer meter located at each wellhead, so the proper point of valuation is at the inlet to these custody transfer meters. The record before us, however, does not establish with sufficient certainty whether these meters are custody transfer meters or volume meters. If they are volume meters, they are not the proper points of valuation. *See Amoco Prod. Co.,* ¶ 31, 94 P.3d at 443. We are unable to resolve this issue based on the record before us, and will remand this case to the Board to determine the correct point of valuation in accordance with this opinion.

*Exxon,* ¶ 52, 219 P.3d at 143–144 (footnote added.)

[¶ 17] This Court has previously interpreted the term "custody transfer meter," as found in Wyo. Stat. Ann. § 39–14–203(b)(iv), in *Amoco Prod. Co. v. Dep't of Revenue,* 2004 WY 89, ¶¶ 34–35, 94 P.3d 430, 444 (Wyo. 2004). The Court interpreted each of the three words within the phrase "custody

---

**5.** The three options referenced are the three places in the production process (the inlet to the initial transportation related compressor, the custody transfer meter or processing facility) upon which the production of natural gas can be considered complete when no dehydration is performed. These three options are listed in the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv), which directs production is deemed complete at the first of the three places to occur.

transfer meter" in arriving at a comprehensive definition.

"Custody" is defined as "immediate charge and control ... exercised by a person or an authority; *also:* safekeeping." Merriam–Webster's Collegiate Dictionary 285 (10th ed. 2000). "Transfer" is defined as "to convey from one person, place, or situation to another: transport" or "to cause to pass from one to another: transmit" or "to make over the possession or control of: convey." *Id.* at 1249. "Meter" is defined as "one that measures; esp: an official measurer of commodities." *Id.* at 729. Construing the words in the context of valuing gas, *a custody transfer meter is an official measurer of gas as it passes from one entity to another for the other's immediate charge or control.*

*Id.,* ¶ 35, 94 P.3d at 444 (emphasis added).

[¶ 18] With this definition in mind the Board in this case concluded that the meters at the wellheads were not "custody transfer meters" for Exxon's share of gas production:

87. ... [T]he meters in question ... are not under the definition set out by the Wyoming Supreme Court in *Amoco,* custody transfer meters with regard to raw gas production owned by Exxon Mobil.

88. Exxon Mobil is the sole leaseholder—working interest owner—in both the Lake Ridge and Graphite Units. It is therefore the only "entity" entitled to the raw gas produced in those Units, thus such gas can not (sic), in any legal senses (sic), pass "from one entity to another for the other's immediate charge or control."

89. The same conclusion applies for the raw gas produced from the Fogarty Creek Unit to which Exxon is entitled. That gas as well does not pass, in fact, cannot pass, from one entity to another at the wing valves as Exxon Mobil is the only entity entitled thereto.

(internal citations omitted).

[¶ 19] Exxon argues that the Board's determination that the meters were not custody transfer meters was erroneous because an "implied" transfer of the gas it owns takes place at the meters at the wells. In support of this argument Exxon emphasizes the fact that the Board found that the meters were custody transfer meters for Howell's and Yates' share of gas and that the meters were therefore the proper valuation point. Accordingly, Exxon argues that its share of the gas, part of a common gas stream along with Howell's and Yates' gas, must have the same uniform point of valuation.

[¶ 20] The Court is not persuaded by Exxon's argument for two reasons. First, a ruling in favor of Exxon would require this Court to modify the *Amoco* definition of a custody transfer meter. The Court declines to do so at this time. "[A] custody transfer meter is an official measurer of gas as it passes from one entity to another for the other's immediate charge or control." *Amoco,* ¶ 35, 94 P.3d at 444.[6] Here, Exxon has custody of the gas both prior to and after the gas passes through the meters at the wells. Therefore, the requirement that the gas pass from "one entity to another" at the meter cannot be satisfied. If the current definition of a "custody transfer meter" were to be modified so as to exclude the one entity to another requirement or to specifically incorporate an implied transfer scenario such as the one at bar, the Court believes the Legislature, rather than this Court, is the appropriate body to make this determination.

[¶ 21] Second, as discussed infra, Howell's and Yates' share of the gas and its valuation point were not issues properly before the Board. Consequently, Exxon's reliance on the Board's rulings as to Howell's and Yates' share of gas is unconvincing.

[¶ 22] The Board's determination that the meters in question were not custody transfer meters for Exxon's share of the gas harmonizes with precedent and definitions established in the *Amoco* decision. Thus, the Court finds that the Board's determination on this issue is supported by substantial evidence, is not arbitrary or capricious and comports with law.

---

**6.** The Court notes that *Amoco* was decided in 2004. The controversy currently before the Court involves gas produced in 2005. Exxon was therefore on notice of the *Amoco* decision and associated definition of a "custody transfer meter."

## II. Howell's and Yates' Point of Valuation–Did the Board have the authority to make this determination?

■ [¶ 23] The final issue is whether it was proper for the Board to determine the meters at the wells were "custody transfer meters" for Howell's and Yates' share of gas production in the LaBarge Field.

■ [¶ 24] Courts must have jurisdiction to hear cases. *See, e.g.,* Wyo. Const. art. 5, §§ 2–3, 10; Wyo. Stat. Ann. § 5–1–107; Wyo. Stat. Ann. § 5–6–102; Wyo. Stat. Ann. §§ 5–9–128—130. Like courts, administrative agencies must have jurisdiction before they can hear a case. *Diamond B Servs., Inc. v. Rohde,* 2005 WY 130, ¶¶ 13–14, 120 P.3d 1031, 1038 (Wyo.2005); *Amoco Prod. Co. v. Wyo. State Bd. of Equalization,* 7 P.3d 900, 904 (Wyo.2000). Whether a court or agency has jurisdiction to decide a particular matter is a question of law, subject to *de novo* review. *Dir. of the Office of State Lands & Invs., Bd. of Land Comm'rs v. Merbanco, Inc.,* 2003 WY 73, ¶ 7, 70 P.3d 241, 246 (Wyo.2003).

> An administrative agency is limited in authority to powers legislatively delegated. Administrative agencies are creatures of statute and their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim.

*Amoco Prod. Co. v. Wyo. State Bd. of Equalization,* 12 P.3d 668, 673 (Wyo.2000) (citations omitted).

[¶ 25] As stated above, administrative agencies derive their jurisdiction and authority via statute. The Wyoming Constitution defines the State Board of Equalization's duties as "equaliz[ing] the valuation on all property in the several counties and other such duties as may be prescribed by law." Wyo. Const. art. 15, § 10. The Board is also charged with "hear[ing] appeals from county boards of equalization and review[ing] final decisions of the department upon application of any interested person adversely affect-ed[.]" Wyo. Stat. Ann. § 39–11–102.1(c).

Any person aggrieved by a Department of Revenue determination may appeal to the Board. Wyo. Stat. Ann. § 39–14–209(b)(i). This would specifically include a taxpayer who feels aggrieved by the valuation of natural gas production and the accompanying severance tax levied by the Department, as is the case here. Wyo. Stat. Ann. § 39–14–209(b)(iv), (vi). In short, the Board has the authority to hear appeals from any *interested person(s) adversely affected by final Department determinations.*

[¶ 26] The Wyoming Supreme Court has discussed the meaning of an adversely affected person: [7]

> An aggrieved or adversely affected person is one who has a legally recognizable interest in that which will be affected by the action. A potential litigant must show injury or potential injury by alleging a perceptible, rather than a speculative, harm resulting from the agency action. The interest which will sustain a right to appeal must generally be substantial, immediate, and pecuniary. A future, contingent, or merely speculative interest is ordinarily not sufficient.

*Northfork Citizens v. Bd. of County Comm'rs of Park County,* 2008 WY 88, ¶ 9, 189 P.3d 260, 262 (Wyo.2008) (citations omitted).

■ [¶ 27] The Court finds that Howell and Yates were not "interested person[s] adversely affected" or "aggrieved person[s]" because they, unlike Exxon, did not appeal the Department's valuation and assessment of taxes on the gas they produced from the LaBarge Field in 2005. Wyo. Stat. Ann. § 39–11–102.1(c); Wyo. Stat. Ann. § 39–14–209(b)(i). Howell and Yates are not, and have never been, parties to this action. If a party does not appeal a decision rendered by an administrative agency, the decision is rendered final as to the non-appealing party. *See, e.g., Amax Coal West, Inc. v. Wyo. State Bd. of Equalization,* 896 P.2d 1329, 1333 (Wyo.1995) (by failing to appeal, taxpayer acquiesced to the valuation formula used by the Department of Revenue in the context of ad valorem property taxes levied on coal

---

**7.** Under the Wyoming Administrative Procedure Act the definition of a "person" who may seek judicial review includes: individuals, partner- ships, corporations and government subdivisions. Wyo. Stat. Ann. § 16–3–101(b)(vii).

production); *Joelson v. City of Casper,* 676 P.2d 570, 573 (Wyo.1984) (homeowners' failure to appeal orders issued by city's administrative agency board divested the district court and this Court of jurisdiction to hear a subsequent case with the same issues and parties that were previously before the administrative agency); *Slavens v. Bd. of County Comm'rs for Uinta County,* 854 P.2d 683, 686–87 (Wyo.1993) (employee's failure to appeal the district court's decision affirming a hearing examiner's determination to terminate the employee barred a subsequent action by the employee since no appeal was taken from the initial administrative decision). Since Howell and Yates did not appeal the Department's original decision regarding gas produced from the LaBarge Field in 2005, there was nothing for the Board, or this Court, to adjudicate concerning Howell and Yates.

[¶ 28] In the context of severance tax levied on natural gas production, the Court holds the Board does not have the authority to determine the valuation point for "non-party" persons or entities that do not appeal their tax assessments. In essence, issues related to Howell's and Yates' share of gas were not properly before Board, the Board acted beyond its statutory authority in rendering decisions on these issues, and as such, these determinations must be reversed.

### CONCLUSION

[¶ 29] The Court affirms the Board's determination that the meters were not custody transfer meters for Exxon's gas. The Court reverses the Board's determination that the meters were custody transfer meters for Howell's and Yates' gas on the basis that the issue was not properly before the Board and that Howell and Yates were not aggrieved parties.[8]

8. In reaching this conclusion the Court does not make a determination on whether different interest owners in a common gas stream can in fact have different points of valuation for tax purposes. Given that Howell and Yates are not parties to the present action, the Court believes the answer to that question should be left for another day when it is properly before the Court.