# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 122

APRIL TERM, A.D. 2022

September 29, 2022

SOLVAY CHEMICALS, INC.,

Appellant
(Petitioner),

v.

S-22-0017

WYOMING DEPARTMENT OF
REVENUE,

Appellee
(Respondent).

*Appeal from the District Court of Sweetwater County*
The Honorable Richard L. Lavery, Judge

*Representing Appellant:*

Walter F. Eggers, III, and Kasey J. Schlueter, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Mr. Eggers.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Brandi Lee Monger, Deputy Attorney General; Karl D. Anderson, Supervising Attorney General; Patrick Miller, Assistant Attorney General. Argument by Mr. Miller.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   Between 2012 and 2015, Solvay Chemicals, Inc. (Solvay) captured and used waste mine gas (WMG) released from its trona mining operations to help fuel its soda ash processing plant.  The Wyoming Department of Revenue (DOR) imposed severance and ad valorem (property) taxes on the WMG Solvay captured and used during those years.[1] Solvay objected, arguing that the relevant severance and ad valorem tax statutes did not impose tax on the WMG.  In the alternative, it maintained the Wyoming Department of Audit (DOA) and DOR improperly valued the WMG.  The Wyoming State Board of Equalization (Board) affirmed the DOR's tax assessment, and the district court affirmed the Board's decision on Solvay's petition for review.  We too affirm.

## ISSUES

[¶2]   Solvay raises two issues which we restate as follows:

1.  Did the Board err by concluding the WMG captured and used by Solvay as fuel was subject to severance and ad valorem taxation under Wyoming law?

2.  Did the Board err by deciding Solvay had failed to meet its burden of showing the DOA and DOR improperly valued the WMG?

## FACTS

[¶3]   Solvay operates an underground trona mine in Sweetwater County based on mineral leases it obtained from Anadarko Land Corporation (Anadarko) and the federal Bureau of Land Management (BLM) (trona leases).  The trona mining operations release WMG, consisting of highly flammable methane and other noxious gases, in the underground mine. Because WMG poses a safety risk to miners and the amount of WMG in the mine is strictly regulated by the federal government, Solvay drills gob-vent boreholes from the surface down to the trona mining levels to evacuate the WMG from the mine.

[¶4]   Prior to 2012, Solvay either released (vented) the evacuated WMG into the atmosphere or incinerated (flared) it.  In 2012, it began using some of the WMG to help power the industrial dryers at its processing plant, where it converts the trona into soda ash. To accomplish this, Solvay collected the WMG from the gob-vent boreholes and ran it through a compressor and a dehydrator.  It then transported the WMG via a pipeline to its processing plant.  At the inlet of the dryers, Solvay mixed the WMG with natural gas it

---

[1] This opinion relates to tax years 2012-2015.  The facts recited in this opinion relate only to those tax years. The record does not indicate that Solvay discontinued its use of captured WMG after 2015, but whether it continued using the WMG thereafter is not relevant to this decision.

1

purchased from Questar Energy Trading Company (QEP) and BP Energy. The mixed gas was then burned to power the dryers.

[¶5] Before Solvay began capturing and using the WMG as fuel, it sought Anadarko's and the BLM's approval. Solvay and Anadarko amended their trona lease to grant Solvay "the right and privilege of producing [WMG] for [Solvay]'s sole use at [Solvay]'s Facilities for the production of [trona and soda ash]." In exchange, Solvay agreed to pay Anadarko a "production royalty" on the WMG. The BLM determined it could not legally lease WMG to Solvay but "approved" of Solvay capturing and using the WMG as fuel.

[¶6] In 2015, while auditing Solvay's trona and soda ash for production years 2010-2012, the DOA discovered Solvay was capturing and using the WMG as fuel but not paying severance or ad valorem taxes on it. Although the DOR believed Solvay's capture and use of the WMG as fuel was taxable and initially assessed severance and ad valorem taxes on the WMG for production years 2010-2012, it withdrew that assessment to allow the DOA to separately audit Solvay's WMG production from 2012-2015. At the completion of this audit, the DOA found the fair market value of the WMG Solvay collected and used during tax years 2012-2015 was $4,780,375 and concluded Solvay owed an additional $286,822.50 in severance taxes for those production years. The DOR adopted the DOA's conclusions in toto, assessed Solvay $286,822.50 in severance taxes, and certified the WMG's fair market value to the county assessor for purposes of ad valorem taxes.[2] Solvay objected, asserting that the WMG was not taxable under the severance or ad valorem tax statutes. The Board affirmed after a contested case hearing. Solvay filed a petition for review in the district court, which also affirmed. This timely appeal followed.

## STANDARD OF REVIEW

[¶7] "We review an administrative decision as if it came directly from the agency and do not defer to the district court's ruling." *Off. of State Lands & Invs. v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 11, 252 P.3d 951, 954 (Wyo. 2011) (citing *Greene v. State ex rel. Wyo. Bd. of Chiropractic Exam'rs*, 2009 WY 42, ¶ 9, 204 P.3d 285, 290 (Wyo. 2009)). The Wyoming Administrative Procedure Act, Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021), governs our review of the Board's decision. *Delcon Partners LLC v. Wyo. Dep't of Revenue*, 2019 WY 106, ¶ 7, 450 P.3d 682, 684 (Wyo. 2019). We normally review the Board's findings of fact under the substantial evidence standard. *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2017 WY 6, ¶ 14, 387 P.3d 725, 729 (Wyo. 2017) (citing *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008), and Section

___

[2] The DOR also assessed Solvay $122,929 in interest from 2012 (when Solvay first began capturing and using the WMG as fuel) to 2018 (when Solvay paid the taxes under protest). At the contested case hearing, the DOR requested the Board remand the interest component of the tax assessment so the DOR could recalculate interest using an accrual date of December 28, 2015, "the first time Solvay had been notified by the [DOR] . . . that [it] . . . truly intended to tax produced [WMG]." The Board granted the DOR's request. The interest assessment is not before us.

2

16-3-114(c)). In this case, however, Solvay does not dispute the Board's factual findings about whether the WMG is taxable but rather its conclusions of law, namely, its interpretation of the relevant statutes. "We review an agency's conclusions of law *de novo* and affirm when they are in accordance with the law." *Id.* *See also*, § 16-3-114(c)(ii)(A) ("The reviewing court shall . . . [h]old unlawful and set aside agency action, findings and conclusions found to be . . . [a]rbitrary, capricious, an abuse of discretion *or otherwise not in accordance with law*[.]") (emphasis added).

[¶8]    "'When interpreting . . . statute[s] and [their] application, we first look at the plain language used by the legislature. If the [statutory language] is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning.'" *Int. of: AA*, 2021 WY 18, ¶ 17, 479 P.3d 1252, 1258 (Wyo. 2021) (quoting *DB v. State (In re CRA)*, 2016 WY 24, ¶ 16, 368 P.3d 294, 298 (Wyo. 2016), and citing *MR v. State (In re CDR)*, 2015 WY 79, ¶ 19, 351 P.3d 264, 269 (Wyo. 2015)).

> "We . . . construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. . . . When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction."

*PacifiCorp, Inc. v. Dep't of Revenue, State*, 2017 WY 106, ¶ 10, 401 P.3d 905, 909 (Wyo. 2017) (quoting *Nicodemus v. Lampert*, 2014 WY 135, ¶ 13, 336 P.3d 671, 674 (Wyo. 2014), and citing *Estate of Dahlke ex rel. Jubie v. Dahlke*, 2014 WY 29, ¶¶ 36-37, 319 P.3d 116, 125-26 (Wyo. 2014)).

## DISCUSSION

[¶9]    Solvay argues the Board erred by determining the WMG it captured and used as fuel was subject to severance and ad valorem taxation. It also claims that, even if the WMG was subject to taxation, the DOA and DOR improperly valued it.

### A. Taxation

[¶10] The Wyoming Constitution provides that all mines "shall be taxed . . . in lieu of taxes on the lands[] on the gross product thereof . . .; provided, that the product of all mines shall be taxed in proportion to the value thereof." Wyo. Const. art. 15, § 3. The legislature, in turn, has imposed severance and ad valorem taxes on the value of the gross product of minerals, including natural gas. Relevant here, Wyo. Stat. Ann. § 39-14-203(a)(i) (LexisNexis 2021) levies "a severance tax on the value of the gross product extracted for

the privilege of severing or extracting . . . natural gas in the state," and Wyo. Stat. Ann. § 39-13-103(b)(iii), (iv) (LexisNexis 2021) provides that the "taxable value" of natural gas, for purposes of ad valorem taxation, is its fair market value.

[¶11]  Solvay maintains the WMG it captured and used as fuel was not subject to severance or ad valorem taxes for two reasons.  First, it claims the WMG was not "natural gas" as required for the taxes established by both the severance tax and the ad valorem tax statutes. Second, it argues it did not have the "privilege of severing or extracting" the WMG for purposes of severance taxation and it was not a "taxpayer" for purposes of ad valorem taxation.

### *Natural Gas*

[¶12]  During the 2012-2015 tax years, "natural gas" was statutorily-defined in pertinent part as "all gases, both hydrocarbon and nonhydrocarbon, that occur naturally beneath the earth's crust and are produced from an oil or gas well."  Wyo. Stat. Ann. § 39-14-201(a)(xv) (LexisNexis 2012).[3]  "Well" meant (and still means) "a hole drilled in the earth for the purpose of finding or producing . . . natural gas."  Section 39-14-201(a)(xxx).  Solvay claims the WMG cannot be "natural gas" under this statutory definition because it was not "produced" from a gas "well."

[¶13]  The Board decided the WMG which Solvay captured and used as fuel was "natural gas" under § 39-14-201(xv) because (1) Solvay did not dispute the WMG was a gas which occurred naturally beneath the earth's crust, and (2) the WMG was "produced from an oil or gas well."  Because the term "produced" was not defined by statute or DOR rule, the Board relied on its precedent which defined "produce" and "production" as "'generally refer[ring] to gas and valuable components removed from the ground which reach the end of the production process, or "point of valuation."'  *In re WPX Energy, Inc.*, 2017 WL 6276019, *9, ¶ 35, Docket No. 2016-31 (Wyo. State Bd. of Equalization, Dec. 1, 2017)." Under § 39-14-203(b)(iv), "[t]he production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator."  The Board concluded the WMG which Solvay captured and used as fuel was "produced" because it went through the "production process," and that process was completed when the WMG reached the outlet of the dehydrator.  The Board also determined the WMG was produced from a "well" because Solvay drilled the gob-vent boreholes in the earth to bring the WMG to the surface, the first step of the production process.  Although venting the WMG into the atmosphere or flaring it was not "production," the Board determined that "[o]nce Solvay began capturing, processing, and using WMG, there was a complete production process."

---

[3] The definition of "natural gas" was amended in 2021 (effective January 1, 2022).  We discuss that amendment below.

4

[¶14] Solvay does not contest on appeal the meaning of the words "produce" and "production" provided by the Board or attempt to define those terms differently. Nor does it seriously dispute the Board's finding that the WMG it captured and used as fuel was "produced" because it completed the "production process." Rather, Solvay claims there is no basis in the law for the DOR and the Board to distinguish between WMG which is "produced" (taxable) and WMG that is "not produced" (not taxable). It also claims the WMG it captured and used as fuel was not "produced" in the same manner as traditional oil and gas because the WMG emerged as an unavoidable consequence of its trona mining operations. As a result, Solvay maintains "the processes are not the same and it cannot be assumed that the Wyoming Legislature contemplated WMG capture and use when it wrote the oil and gas production tax statutes."

[¶15] Solvay acknowledges the Wyoming Constitution and § 39-14-203(a)(i) levy taxes on the value of the gross mineral product. The legislature has defined "[v]alue of the gross product" as the "fair market value as prescribed by W.S. 39-14-203(b), less any deductions and exemption allowed by Wyoming law or rules." Section 39-14-201(a)(xxix). Solvay also acknowledges the fair market value for natural gas is to be determined "after the production process is completed." Section 39-14-203(b)(ii). It further acknowledges the legislature has charged the DOR with valuing natural gas production at its fair market value for taxation purposes, *see* Wyo. Stat. Ann. § 39-14-202(a)(i)-(iii) (LexisNexis 2021), and has defined "severance tax" as "an excise tax imposed on the present and continuing privilege of removing, extracting, severing or *producing any mineral* in this state" and "natural gas" as all gases occurring naturally beneath the earth's surface and "*produced* from an oil or gas well." Section 39-14-201(a)(xv) (natural gas), (xxiii) (severance tax) (emphasis added). Even Solvay collectively refers to the severance and ad valorem taxes at issue in this case as "production taxes" in its brief.

[¶16] Reading the above provisions *in para materia* leaves little question that the legislature intended to tax "produced" natural gas, that is, gas which has completed the "production process." As stated above, Solvay does not dispute that the WMG it captured and used as fuel completed the "production process" and was "produced." On the other hand, the evidence showed WMG which is simply released into the atmosphere or flared does not complete the "production process" and therefore is "not produced."[4]

[¶17] The fact that the WMG emerged as an unavoidable consequence of Solvay's trona mining operations is of no moment. Tony Crosby, Solvay's plant controller, testified the capture and use of the WMG as fuel "was an intentional decision . . . on Solvay's part." In

---

[4] There was discussion at oral argument as to whether the tax distinction between "produced" and "not produced" WMG incentivizes waste. "Our role . . . is not to determine whether the legislature's chosen policy is the best one; it is to give effect to the one it chose." *Delcon Partners LLC*, ¶ 9, 450 P.3d at 685. *See also, Worden v. Vill. Homes*, 821 P.2d 1291, 1295 (Wyo. 1991) ("Much of Worden's argument discusses policy considerations concerning her perceived unfairness of the statute . . . . Such policy arguments are for the legislature to consider in its enactment of statutory law and generally not for us.").

other words, Solvay is not materially different than other oil and gas production companies which intentionally extract, collect, compress, and dehydrate natural gas. While the release of WMG from the mine may have been "unavoidable," Solvay's capture and use of it was not. Moreover, while Solvay was the first mining operation in the nation to develop a process to capture and use WMG as fuel, the fact that an event is novel does not relieve it from the operation of tax statutes which clearly apply. *Cf. Adams v. Antonio*, 88 S.W.2d 503, 506 (Tex. Civ. App. 1935) ("The fact that [an item] is novel in character does not relieve it from the operation of the statute[.]").

[¶18]   Solvay argues the WMG it captured and used as fuel was not "natural gas" because it was not produced from a "well." It claims the gob-vent boreholes do not satisfy the statutory definition of "well" because they were not drilled "for the purpose of" finding or producing natural gas. Section 39-14-201(a)(xxx). According to Solvay, "the purpose of the [gob-vent boreholes] is - and always has been - to release WMG from the mine to provide for miner safety and to allow the mining of trona and production of soda ash."

[¶19]   The plain meaning of "purpose" is "something set up as an object or end to be attained: INTENTION." https://www.merriam-webster.com/dictionary/purpose. Black's Law Dictionary defines it as "[a]n objective, goal, or end[.]" *Purpose*, Black's Law Dictionary (11th ed. 2019).

[¶20]   Craig Grenvik, the Administrator of the DOR's Mineral Tax Division, conceded the gob-vent boreholes were not drilled for the purpose of "finding" WMG. The question is whether the gob-vent wells were drilled "for the purpose of" producing WMG. Mr. Crosby and David Rea, Solvay's mine engineer, testified Solvay drilled the gob-vent boreholes to evacuate the WMG from the mine for the miners' safety. Mr. Rea also stated that if Solvay stopped capturing the WMG and using it as fuel, it would continue to drill the gob-vent boreholes to evacuate WMG from the mine. However, the evidence showed Solvay's WMG fuel project had three "objectives": (1) "[i]mprove safety of miners," (2) "[r]educe greenhouse gas emissions" produced by venting and flaring, and (3) "[c]apture waste stream energy" to help fuel the dryers. The first step in capturing the WMG so it could be used as fuel (i.e., produced) was drilling the gob-vent boreholes. As a result, one of the purposes of drilling the gob-vent boreholes was to produce the WMG.

[¶21]   Nothing in the statutory definition of "well" indicates the hole must be drilled for the sole or exclusive purpose of producing natural gas or even that the primary purpose of drilling the hole must be to produce natural gas. If the legislature wanted to define "well" as a hole drilled for the sole or primary purpose of finding or producing oil or gas, it could have included language to that effect in the statute as it has in other statutes. *See, e.g., Life Care Ctr. of Casper v. Barrett*, 2020 WY 57, ¶ 18, 462 P.3d 894, 899 (Wyo. 2020) ("Wyo. Stat. Ann. § 1-38-103(b) provides that the appointment of a wrongful death representative 'shall be made in a separate action brought **solely** for appointing the wrongful death representative.' By its plain terms, the statute limits the proceeding to a single purpose: to

make the requested appointment.") (emphasis in original, some emphasis omitted); Wyo. Stat. Ann. § 9-12-1501(h) (LexisNexis 2021) (defining "[l]ast-mile" as "a broadband project for fixed terrestrial infrastructure, including fixed wireless infrastructure, *the primary purpose* of which is to provide broadband internet service to end users or end-user devices") (emphasis added); Wyo. Stat. Ann. § 21-3-303(b) (LexisNexis 2021) ("No charter shall be granted under this article if it is determined that *its sole purpose* is to avoid consolidation or closure of any school or district.") (emphasis added). The fact that the legislature did not include such limiting language in the definition of "well" indicates it did not intend such limitation. *See, e.g., Wyo. State Hosp. v. Romine*, 2021 WY 47, ¶ 29, 483 P.3d 840, 848 (Wyo. 2021) ("The use of the term 'malpractice claims' in the Medical Review Panel Act demonstrates the legislature knew how to limit the scope of a statute to malpractice claims. It did not include any such limitation in § 1-39-110 and we are not at liberty to read one into it."); *Rodriguez v. Casey*, 2002 WY 111, ¶ 10, 50 P.3d 323, 327 (Wyo. 2002) ("We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another.") (citations omitted).

[¶22] Finally, Solvay contends the legislature's 2021 amendment of the definition of "natural gas" demonstrates the legislature did not intend for WMG to be taxed prior to 2021. In fact, if WMG was taxable prior to 2021, Solvay argues there was no need for the legislature to amend the definition of "natural gas" and the amendment was redundant.

[¶23] While this case was pending in the district court, the legislature added the italicized language to the definition of "natural gas":

> "Natural gas" means all gases, both hydrocarbon and nonhydrocarbon, that occur naturally beneath the earth's crust and are produced from an oil or gas well. *For the purposes of taxation, the term natural gas includes:*
> *\* \* \**
> *    (B) Natural gas that is consumed on the site where the natural gas is produced for any purpose except for those specified in W.S. 39-14-205(j) and (m).*[5]

---

[5] The two exceptions are:

> (j) Natural gas which is vented or flared under the authority of the Wyoming oil and gas conservation commission and natural gas which is reinjected or consumed prior to sale for the purpose of maintaining, stimulating, treating, transporting or producing crude oil or natural gas on the same lease or unit from which it was produced has no value and is exempt from taxation.
>
>     . . . .

7

Section 39-14-201(xv) (LexisNexis 2022) (emphasis added). *See also,* 2021 Wyo. Sess. Laws, ch. 156, § 1.

[¶24] The original definition of "natural gas" is not ambiguous and Solvay does not contend otherwise. As a result, resort to our rules of statutory construction, including looking to historical or subsequent legislative action, is generally prohibited. *See Roman v. State*, 2022 WY 48, ¶ 15, 507 P.3d 453, 457 (Wyo. 2022) ("'When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction.'" (quoting *Yager v. State*, 2015 WY 139, ¶ 11, 362 P.3d 777, 780 (Wyo. 2015)); *McCallister v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2019 WY 47, ¶ 31, 440 P.3d 1078, 1086 (Wyo. 2019) ("Typically, this Court does not resort to rules of statutory construction when the language of the statute is clear.") (citing *Mathewson v. City of Cheyenne*, 2003 WY 10, ¶ 6, 61 P.3d 1229, 1232 (Wyo. 2003)); *Bates v. Chicago Lumber Co. of Omaha*, 2016 WY 58, ¶ 28, 375 P.3d 732, 739 (Wyo. 2016) ("'[W]here the legislature, by subsequent amendment or legislation in the same act or on the same subject, *enacts language which clarifies previously ambiguous language*, the subsequent language gives meaning to the previously ambiguous expression.'" (emphasis added) (quoting *Moncrief v. Wyo. State Bd. of Equalization*, 856 P.2d 440, 444-45 (Wyo. 1993)).

[¶25] That being said, even if a statute is unambiguous, we occasionally resort to extrinsic aids of interpretation to <u>confirm</u> our interpretation is consistent with the legislature's intent. *See McCallister*, ¶ 31, 440 P.3d at 1086 ("[W]e occasionally consult legislative history to confirm the legislature's intent even when the language seems clear."); *Baker v. State*, 2010 WY 6, ¶ 30, 223 P.3d 542, 553 (Wyo. 2010) ("[W]hile a determination that the meaning is not subject to varying interpretations will usually end our inquiry, we may resort to extrinsic aids of interpretation, such as legislative history and rules of construction, to confirm our determination." (quoting *Houghton v. Franscell*, 870 P.2d 1050, 1054 (Wyo. 1994) (other citation omitted)); *Cheyenne Newspapers, Inc. v. Bd. of Trs. of Laramie Cnty. Sch. Dist. No. One*, 2016 WY 113, ¶ 11, 384 P.3d 679, 683 (Wyo. 2016) ("Even where a statute is unambiguous, however, we may resort to extrinsic aids of interpretation to confirm the meaning the legislature intended for the terms it used." (citations omitted)).

[¶26] We have recognized that an amendment to a statute does not necessarily indicate that the prior statute was ambiguous, but rather the amendment may confirm what the previous unambiguous language said. In *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Johnson*, 2008 WY 59, ¶¶ 3, 6, 185 P.3d 16, 17-18 (Wyo. 2008), a hearing examiner

---

> (m) Natural gas which is consumed prior to sale for treating by-product water as defined in W.S. 41-3-903 so the water is acceptable for beneficial use in Wyoming has no value and is exempt from taxation.

Neither exception applies here, and Solvay does not argue otherwise.

denied the injured worker's request for extended permanent total disability benefits because, after factoring in his wife's income, the worker's "'combined household income exceeded [his] combined household expenses[.]'" The injured worker appealed, claiming the hearing examiner erred in considering his wife's income in determining his entitlement to benefits. *Id.*, ¶¶ 6-8, 185 P.3d at 18. We agreed. *Id.*, ¶ 9, 185 P.3d at 18. We concluded the plain language of the relevant statute prohibited consideration of "household income" that is not "income of the employee." *Id.*, ¶ 10, 185 P.3d at 18-19. We also determined an amendment to the relevant statute "made clear [our] interpretation [of the statute] accurately reflect[ed] the intent of the law." *Id.*, ¶ 11, 185 P.3d at 19. We explained:

> Th[e] amendment clearly excludes household income that was not "income of the employee" from consideration. The preamble to the session law in which the legislature adopted [the] changes specified the law's purpose as "clarifying which household income may and may not be used in calculating extended benefits." 1998 Wyo. Sess. Laws, Ch. 117. "While a preamble to a statute is not binding, it is worthy of consideration by the court in discerning the legislature's intention in adopting a statute." *Rawlinson v. Greer*, 2003 WY 28, ¶ 20, 64 P.3d 120, 124 (Wyo. 2003). The legislature denoted the change as a clarification of existing law regarding household income under this statute rather than a change in the status quo. The necessary inference is that the income of other household members has always been excluded from consideration.

*Id.*

[¶27] Similarly, in *Pagel v. Franscell*, 2002 WY 169, ¶ 3, 57 P.3d 1226, 1228 (Wyo. 2002), a newspaper asked the Wyoming Division of Criminal Investigation (DCI) for a list of all county residents holding permits to carry a concealed weapon. DCI denied the request and filed an action in the district court seeking an order prohibiting such disclosure. *Id.*, ¶¶ 3-4, 57 P.3d at 1228-29. During the district court proceedings, the legislature amended the applicable statute to state that lists or other records maintained by DCI or other law enforcement agencies which identified individuals holding a concealed firearm permit are not a public record and made the amendment retroactive. *Id.*, ¶ 5, 57 P.3d at 1229. On appeal, we concluded the relevant statute was not ambiguous and "[r]eview of the plain and ordinary meaning of the words used therein makes it evident that the legislature only intended to provide limited access to any lists of those holding permits to carry a concealed weapon and other related information and that this information should therefore not be considered a public record which may be released to the general public." *Id.*, ¶ 17, 57 P.3d at 1232. We also determined the recent amendment to the statute which "explicitly include[d] a statement that the information sought to be disclosed by [the]

[n]ewspaper is not to be considered a public record" was "telling and . . . supportive of our ultimate decision[.]" *Id.*, ¶ 18, 57 P.3d at 1232. We rejected any argument (like the one made by Solvay in this appeal) that the amendment to the statute clarified that the legislature did not previously intend to limit access to the records sought by the newspaper. *Id.*, ¶ 19, 57 P.3d at 1232-33. We explained: "To the contrary, the modifications made by the Wyoming legislature in 2001 must be seen as merely a clarification of the legislature's original intentions concerning the limited dissemination of the names and identities of those issued a concealed weapons permit. Thus, these modifications may only be interpreted as an act by the legislature to leave no doubt as to this matter." *Id.*, ¶ 19, 57 P.3d at 1233.

[¶28] In this case, the preamble to the session law amendingthe definition of "natural gas" stated the amendment's purpose was to "clarify[] the imposition of severance taxes on natural gas that is consumed on-site." *See* 2021 Wyo. Sess. Laws, ch. 156. In other words, the legislature merely intended to clarify that the original definition of "natural gas" included, for tax purposes, natural gas which is consumed on site where the gas is produced. The 2021 amendment confirms our interpretation of the original definition is consistent with the legislature's intent—the WMG which Solvay captured and used as fuel was "natural gas" subject to taxation.

### *Privilege/Taxpayer under § 39-14-203*

[¶29] Solvay maintains the severance and ad valorem tax statutes cannot apply because it did not have "the privilege" of severing or extracting the WMG mentioned in § 39-14-203(a)(i), nor was it a "taxpayer" for purposes of ad valorem taxation under § 39-14-203(c)(i). Solvay bases this argument on the fact that it did not have a lease from the BLM to produce the WMG. According to Solvay, the BLM did not have the authority to lease the WMG to Solvay because WMG is not an oil or gas deposit subject to federal leasing. *See Vessels Coal Gas, Inc.*, 175 IBLA 8, 26 (June 26, 2008) ("The methane mixture released by coal mining into the environment, which the EPA contends should be captured, from vents drilled by the coal mine operator, at the direction of [the U.S. Mine safety and Health Administration] for protection of coal miners, is not the oil and gas deposit addressed by leasing under the [Mineral Leasing Act].").

[¶30] Solvay acknowledges it had a lease from Anadarko to produce the WMG. In exchange for a royalty, Anadarko granted Solvay "the right and privilege of producing [WMG] for [Solvay]'s sole use at [Solvay]'s Facilities for the production of [trona and soda ash]." Therefore, Solvay's argument is limited to asserting it did not have the "privilege of severing or extracting" the WMG belonging to the BLM because it did not have a federal oil and gas lease.

[¶31] "[P]rivilege" is not defined by the legislature or by DOR rule. As a result, the Board relied on the definition from Black's Law Dictionary, which defines "privilege" as "[a]

10

special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty . . . . A privilege grants someone the legal freedom to do or not do a given act. It immunizes conduct that, under ordinary circumstances, would subject the actor to liability." *See Privilege*, Black's Law Dictionary (11th ed. 2019). The Board concluded: "Solvay has a special legal right, granted by BLM and Anadarko, to produce WMG. That right meets the dictionary definition of privilege." The Board also recognized that multiple sections of Title 39, Ch. 14 use identical or nearly identical "privilege" language to impose severance taxes on crude oil, lease condensate, natural gas, federal helium, trona, and uranium, yet the legislature defined privilege only in the section pertaining to taxing federal helium. *See* Wyo. Stat. Ann. §§ 39-14-203(a)(i) (crude oil, lease condensate, and natural gas), 39-14-212(c) (federal helium), 39-14-303(a)(i) (trona), 39-14-503(a)(i) (uranium). The legislature defined the "privilege of removing, extracting, severing or producing" helium as "the right to physically separate the helium, by itself, or as a component of the gas stream, from the ground." Section 39-14-212(a)(ii). The Board found "no reason why 'the privilege of severing or extracting' natural gas should mean something very different than the 'continuing privilege of removing, extracting, severing or producing' helium." "Accepting that the privilege of severing or extracting natural gas means, as it does with helium, simply the right to do so," the Board concluded there was no need for Solvay to have had a BLM lease.

[¶32]   Again, Solvay does not contest on appeal the plain meaning of the word "privilege" provided by the Board or offer an alternative definition. Nor does it dispute that it had the BLM's permission to sever and extract the WMG it captured and used as fuel. Mr. Crosby testified that although the BLM concluded it could not lease the WMG to Solvay, the BLM "approve[d]" of Solvay's plan to capture and use the WMG as fuel and gave Solvay "permission" to do so. Solvay's argument that it did not have the "privilege of severing or extracting" the WMG because it did not have a federal lease to produce the WMG is based entirely on our decision in *Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, 162 P.3d 515 (Wyo. 2007).

[¶33]   ExxonMobil produced natural gas containing helium from wells located on federal leases. *Exxon Mobil Corp.*, ¶ 7, 162 P.3d at 519. Because the Mineral Lease Act of 1920 required the federal government to reserve the ownership and right to extract helium from all gas produced from federal mineral leases, the federal leases applicable to ExxonMobil's oil and gas wells gave ExxonMobil "the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all of the oil and gas deposits **except helium gas**" and specifically reserved to the federal government "the ownership and the right to extract helium from all gas produced under this lease." *Id.*, ¶ 9, 162 P.3d at 519-20 (emphasis in original). As a result, ExxonMobil had to purchase the helium separated from the gas stream from the federal government. *Id.*, ¶ 10, 162 P.3d at 520. ExxonMobil then re-sold the helium. *Id.*, ¶ 12, 162 P.3d at 521. The DOR determined ExxonMobil owed severance and ad valorem taxes on the helium. *Id.*, ¶ 13, 162 P.3d at 521. We disagreed. With respect to severance taxes, we concluded:

11

> ExxonMobil does not possess the privilege of removing, extracting, severing or producing the helium. By virtue of Congress' limitations under the Mineral Leasing Act of 1920, the privilege of severing or extracting helium has not and cannot be assigned or conveyed to ExxonMobil. This legal limitation necessitated the [agreement between ExxonMobil and the federal government], under which the federal government sells the crude helium, following its extraction from the gas stream.

*Id.*, ¶ 32, 162 P.3d at 526.

[¶34] Contrary to Solvay's argument, we did not hold that ExxonMobil's lack of a lease meant it did not have the privilege of severing or extracting helium. Rather, we concluded in the "unique situation" presented, ExxonMobil did not have the privilege of severing or extracting helium because federal law and its federal leases specifically reserved for the federal government the ownership of and exclusive right to extract the helium from all gas produced. *Id.*, ¶ 33, 162 P.3d at 526. As a result, ExxonMobil had to purchase the helium from the federal government. In this case, the BLM did not reserve for itself the ownership of and exclusive right to extract the WMG in its trona leases with Solvay, and it specifically granted Solvay permission to extract the WMG and use it as fuel. Solvay did not need to purchase the WMG from the BLM.

[¶35] Solvay also argues it was not a "taxpayer" for purposes of ad valorem taxation because the legislature has defined "taxpayer" as a "lessor, lessee, or the lessee's assignee," *see Exxon Mobil Corp.*, ¶ 26, 162 P.3d at 524 (citing § 39-14-203(c)(i)), and it did not hold a federal oil and gas lease to produce the WMG.

[¶36] The full text of § 39-14-203(c)(i) states in pertinent part:

> (c) Taxpayer. The following shall apply:
> (i) In the case of ad valorem taxes on . . . natural gas produced under lease, the lessor is liable for the payment of ad valorem taxes on . . . natural gas production removed only to the extent of the lessor's retained interest under the lease, whether royalty or otherwise, and the lessee or his assignee is liable for all other ad valorem taxes due on production under the lease[.]

[¶37] Solvay argues this statute specifies that only a lessor, lessee, or lessee's assignee can be a taxpayer, based on our statement in *Exxon Mobil Corp.*: "For purposes of ad valorem taxes on natural gas the legislature has defined taxpayer as the lessor, lessee, or

the lessee's assignee. Wyo. Stat. Ann. § 39-14-203(c)(i)." *See Exxon Mobil Corp.*, ¶ 26, 162 P.3d at 524. However, the context of that case, and of the quoted statement, was that ExxonMobil produced natural gas under a federal lease. Neither *Exxon Mobil Corp.* nor the statute addresses the issue of who might be a taxpayer when there is permissive production without a lease.

[¶38] Section 39-14-203(c)(i), when read as a whole, merely specifies which party when there is a lease—the lessor or lessee or both—is responsible for ad valorem taxes on the production of natural gas when it is produced pursuant to a lease. It does not indicate that a lease is required for someone to be a taxpayer.

[¶39] Solvay also relies on *Exxon Mobil Corp.*, *Amoco Prod. Co. v. Dep't of Revenue*, 2004 WY 89, ¶ 18, 94 P.3d 430, 438 (Wyo. 2004), and *Chevron U.S.A. Inc. v. State*, 918 P.2d 980, 985 (Wyo. 1996), for the proposition that extending the oil and gas tax statutes to WMG is contrary to our rules of interpretation of tax statutes. According to Solvay, a tax statute cannot be interpreted to impose tax in a manner not specifically addressed in the statute and, in case of doubt, the statute must be construed against the government and in favor of the taxpayer. In short, Solvay tells us, there must be a clear, definite, and unambiguous statement applying the natural gas severance and ad valorem tax imposition statutes to WMG or they do not apply. Because there is no such statement in the severance or ad valorem statutes, Solvay argues that if the DOR wants to tax Solvay's capture and use of WMG, its remedy lies with the legislature.

[¶40] The statutes levying severance and ad valorem taxes on natural gas are not ambiguous and Solvay does not contend otherwise. They clearly, definitely, and unambiguously apply to the WMG which Solvay captured and used as fuel. *See Exxon Mobil Corp.*, ¶ 29, 162 P.3d at 525 ("[T]axes may not be imposed by any means other than a clear, definite and unambiguous statement of legislative authority.") (citations and quotations omitted). Because they are not ambiguous, there is no need to construe them, let alone construe them in Solvay's favor. *See Amoco Prod. Co.*, ¶ 18, 94 P.3d at 438 ("'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. *In case of doubt* they are construed most strongly against the government and in favor of the citizen.'" (emphasis added) (quoting *Chevron U.S.A. Inc.*, 918 P.2d at 985)).

### B. Valuation

[¶41] As stated above*,* § 39-14-203(a)(i) levies "a severance tax *on the value of the gross product* extracted for the privilege of severing or extracting . . . natural gas in the state." "'Value of the gross product' means fair market value as prescribed by W.S. 39-14-203(b), less any deductions and exemption allowed by Wyoming law or rule[.]" Section 39-14-201(a)(xxix). Section 39-14-203(b)(vi), in turn, provides:

(vi) In the event the . . . natural gas production . . . is used without sale, the department shall identify the method it intends to apply under this paragraph to determine the fair market value and notify the taxpayer of that method on or before September 1 of the year preceding the year for which the method shall be employed. The department shall determine the fair market value by application of one (1) of the following methods:
* * * *

(B) Comparable value--The fair market value is the arms-length sales price less processing and transportation fees charged to other parties for minerals of like quantity, taking into consideration the quality, terms and conditions under which the minerals are being processed or transported.

Section 39-14-203(b)(ii) requires the fair market value of natural gas to be "determined after the production process is completed," and § 39-14-203(b)(iv) states that if dehydration is used, the production process is completed at the outlet of the initial dehydrator.

[¶42]   In this case, the DOA valued the WMG using the "comparable value" method. The auditor explained:

[Solvay] sent us the [WMG] volumes in MMBtu. We used the MMBtu volumes as audited volumes. Solvay buys gas for [its] dryers from QEP and BP Energy. We used a weighted average price from QEP and BP Energy to value the MMBtu volumes. There is a dehydrator right after the compressor. We allowed a deduction from the outlet of the dehydrator to the inlet of the dryers. The deduction was calculated using a weighted average tariff from Northwest Pipeline and Questar Pipeline. We used these two pipelines as Solvay buys gas from BP Energy and Questar. We took the weighted average tariff times the MMBtu volumes to come up with a total transportation deduction. We subtracted the allowed deduction from the audited value to come up with a net taxable value. We took the net taxable value times the tax rate of 6% to come up with an additional tax due.

(Internal citations omitted).

[¶43]   Solvay argues the DOA and DOR's valuation of the WMG was improper. Its argument is two-fold.

14

[¶44] First, Solvay claims the DOR violated § 39-14-203(b)(vi) by failing to notify it that the DOA would be applying the "comparable value" method to value the WMG. It claims that had it been provided notice, it would have had the opportunity to object to the selection of the "comparable value" method, the "comparables" the DOA used in its valuation, and the DOA's ultimate value calculation (which the DOR adopted).

[¶45] Mr. Grenvik admitted the DOR did not provide Solvay the statutorily-required notice. However, he asserted it did not and could not do so because Solvay never informed the DOR that it was producing natural gas. The Board concluded the DOR's failure to provide notice in this situation did not violate the statute. It reasoned: "The legislature could not have intended that a company could lawfully avoid severance tax by just not telling the [DOR] that it is extracting minerals: that would be absurd. *Crow v. 2010-1 RADC/CADC Venture, LLC*, 2018 WY 139, ¶ 9, 430 P.3d 1171, 1173-74 (Wyo. 2018) (citing *Adelake v. State*, 2015 WY 30, ¶ 13, 344 P.3d 761, 765-66 (Wyo. 2015) ('This Court will not interpret a statute . . . in a manner producing absurd results.')." In any event, the Board concluded Solvay's remedy for the DOR's failure to provide the required notice was found in § 39-14-203(b)(ix): "If the department fails to notify the taxpayer of the method selected pursuant to paragraph (vi) of this subsection, the taxpayer shall select a method and inform the department." The Board found Solvay had failed to avail itself of its statutory remedy.

[¶46] Solvay argues the DOR's failure to provide timely notice cannot be excused on the basis it did not inform the DOR that it was capturing and using WMG. According to Solvay, the DOR has known since 2015 that Solvay was capturing and using WMG and has, since that time, taken the position that such activity is subject to severance and ad valorem taxation. Nevertheless, the DOR never provided Solvay notice that it would be applying the "comparable value" method. Solvay maintains: "This fact alone should result in reversal of the assessment at issue in this case because Solvay has not had the opportunity provided by statute to meaningfully examine and challenge the section of the valuation method."

[¶47] The problem for Solvay is that it too has known since 2015 that the DOR believed Solvay's capture and use of WMG as fuel was a taxable event and it would value the WMG under the "comparable value" method. On December 28, 2015, the DOA sent a preliminary issue letter to Solvay after auditing its trona production for years 2010-2012. In this letter, the DOR informed Solvay that "because [it was] severing a taxable mineral from the ground, [the WMG was] subject to severance and [ad valorem] taxes." It also informed Solvay that to value the WMG, it used a "comparable contract in Sweetwater County." In any event, as the Board concluded, the remedy for failing to receive the statutory-required notice is the taxpayer selects the method and informs the DOR. Mr. Grenvik confirmed at the contested case hearing that Solvay did neither.

[¶48] Second, Solvay claims the DOA and DOR did not properly apply the "comparable value" method. It asserts the DOR made no showing at the contested case hearing that the commercially-produced natural gas it purchased from QEP and BP Energy was sufficiently "comparable," in quantity, quality, or terms and conditions, to the WMG Solvay captured from its trona mining operations and used at its plant. It also maintains the DOA and DOR did not support the deduction granted.

[¶49] The Board concluded Solvay's arguments misstated the burden of proof as it was Solvay's burden to show the valuation of the WMG was wrong. It decided Solvay could not satisfy its burden "by arguing that the [DOR] failed to carry a burden that it didn't have." We agree. "[T]he burden of proof with respect to tax valuation is on the party asserting an improper valuation." *Williams Prod. RMT Co. v. State Dep't of Revenue*, 2005 WY 28, ¶ 7, 107 P.3d 179, 183 (Wyo. 2005) (citing *Amoco Prod. Co.*, 899 P.2d at 858, and *Teton Valley Ranch v. State Bd. of Equalization,* 735 P.2d 107, 113 (Wyo. 1987)). Claiming, in conclusory terms, that the DOA and DOR did not show they properly valued the WMG does not satisfy that burden. Even so, we see no merit to Solvay's arguments.

[¶50] Toni Hayes from the DOA audited Solvay's WMG for production years 2012-2015. She relied on the prices QEP and BP Energy charged Solvay for natural gas during those years to determine the fair market value of the WMG. She explained these prices were sufficient "comparables" because "[i]f [Solvay is] buying [natural gas] from QEP and BP, and [Solvay is] commingling [the WMG with the purchased natural gas] right before [the gases] go[] in the dryer, [the gases] have to be of like quality." Mr. Grenvik similarly testified Solvay's transactions with QEP and BP Energy were "comparable" to Solvay's capture and use of the WMG as fuel because Solvay was using the WMG for the same purpose as the natural gas it purchased from these companies—to fuel the dryers.

[¶51] The evidence showed the WMG produced by Solvay was of a lesser quality than the natural gas purchased from QEP and BP Energy because it contained impurities. As a result, it required a larger physical volume of WMG to provide the same thermal output as the purchased gas. However, consistent with § 39-14-203(b)(vi)(B), Ms. Hayes took this difference in quality "into consideration" and, to account for it, measured the gases by their MMBtu volume (the ability of the gases to heat) rather than their physical volume. Mr. Crosby and Mr. Rea testified that one MMBtu of the WMG heated the dryers in the same fashion as one MMBtu of purchased gas. Therefore, as Mr. Rea admitted, comparing one MMBtu of WMG with one MMBtu of purchased gas is "comparing apples to apples."

[¶52] Ms. Hayes considered "the terms and conditions" of the contracts Solvay had with QEP and BP Energy for the purchase of natural gas. She stated she reviewed portions of those contracts to determine the price Solvay paid per MMBtu of natural gas and noted Solvay did not receive a discount based on the volume of natural gas it purchased. When asked how she was able to determine, without looking at the entire contracts, whether Solvay's contracts with QEP and BP Energy had similar "terms and conditions" as

16

Solvay's capture and use of the WMG, Ms. Hayes responded that Solvay only sent her portions of the contracts and she assumed that if there were other relevant "terms and conditions," "Solvay would have sent [her] the whole contract[s] when [she] requested [them]."

[¶53] Finally, Ms. Hayes recognized Solvay was entitled to a deduction for the costs of transporting the WMG from the dehydrator to the processing plant because § 39-14-203(b)(ii), (iv) states the fair market value of natural gas is to be determined at the outlet of the dehydrator. Because Solvay did not provide her any information regarding the actual costs it incurred to transport the WMG from the dehydrator to the plant, Ms. Hayes relied on the publicly-available tariff rates QEP and BP Energy paid pipeline companies to transport their natural gas. Both Ms. Hayes and Mr. Grenvik recognized the allowed transportation deduction was not "perfect." However, both believed it was "reasonable" given the information they had.

## CONCLUSION

[¶54] The WMG that Solvay captured and used as fuel was subject to severance and ad valorem taxation, and Solvay failed to show the DOA and DOR improperly valued the WMG for production years 2012-2015.

[¶55] Affirmed.